OPINION OF THE COURT
David Goldstein, J.
This case presents a novel issue, namely, whether, pursuant to New York City Health and Hospitals Corporation Act § 7 (4) (|HHC Act] McKinney’s Uncons Laws of NY § 7387 [4]; L 1969, ch 1016, § 1), a 1906 statute (L 1906, ch 456) and New York City Charter (Uniform Land Use Review Procedure [ULURP]) §§ 197-c and 197-d, the Council of the City of New York has a role in deciding whether the use and occupancy of the Neponsit Health Care Center (the Facility) may be surrendered to the City of New York and whether the Facility buildings may be demolished.
Factual Background
The Facility, which comprises three buildings in Queens, provides public nursing home services to the indigent. In 1906, *802 the State Legislature authorized the City to acquire, through condemnation, a parcel of land on the Rockaway peninsula for use as parkland (see, L 1906, ch 456 [the 1906 statute]). The legislation authorized the then Board of Estimate and Apportionment (Board of Estimate) to appropriate monies for the acquisition and conferred upon a Parks Board the power to manage and control the park, subject to mayoral approval. It also empowered the Board of Estimate, upon appropriation of monies, to withdraw from the jurisdiction of the Parks Department, a portion of the property for the erection and maintenance of a hospital or hospitals, and to confer jurisdiction of the hospital(s) upon the Board of Health, the Board of Trustees of Bellevue and Allied Hospitals or the Commissioner of Public Charities. The Board of Estimate had the authority to approve a sinking fund commission and to permit the use of the withdrawn portions for a, period of 30 years, with renewals for 20-year periods. This was to be by any charitable or benevolent society of the City, which would erect the hospital(s) and provide for the care of residents, provided, in the judgment of the Board of Estimate, the hospital(s) did not disfigure the park or interfere with the primary purposes of public use and recreation. The statute further required the Board of Estimate to include in the City’s annual budget sufficient funds to maintain, support and improve the hospital(s) which had been established.
On December 14, 1911, the Board of Estimate directed the Corporation Counsel of the City of New York to proceed with the acquisition of a park site in the Rockaways. By successive resolutions in 1911, 1912 nnd 1913, the Board of Estimate acquired a tract of land by condemnation, consisting of approximately 262 acres, which was to be used as parkland. Title was vested in the City by resolution of the Board of Estimate on March 21, 1912, and the final decree of condemnation was dated April 14, 1913. By resolution adopted April 24, 1913, the Board of Estimate (1) withdrew a 14.4-acre site from the jurisdiction of the Department of Parks (see, Aldrich v City of New York, 208 Misc 930, affd 2 AD2d 760), (2) authorized the New York Association for Improving the Condition of the Poor to erect a hospital to be devoted to aiding those suffering from joint and bone tuberculosis, and (3) conferred jurisdiction of the Facility to be constructed upon the Board of Trustees of Bellevue and Allied Hospitals. Building No. 1 of the Facility opened in 1914 as the Neponsit Beach Hospital, serving children diagnosed with tuberculosis. In 1938, building Nos. 2 and 3 were added.
*803 During World War II, the United States Public Health Service operated the Facility as a tuberculosis hospital for merchant marines. Following the war, the Facility became known as the Neponsit Beach Hospital for Crippled and Tubercular Children, until it closed in 1955. Thereafter, the Facility was not used until 1964, when it reopened as the Neponsit Home for the Aged. Plaintiffs claim that, in preparation for the reopening, the Facility underwent extensive renovations, funded by Board of Estimate appropriations, and that it functioned under the auspices of the New York City Human Resources Administration, into which the Department of Welfare had been absorbed.
Thereafter, the New York State Legislature enacted the HHC Act, effective July 1, 1970, which created the New York City Health and Hospitals Corporation (HHC), a public benefit corporation, to assume responsibility for the operation of the City’s municipal hospital system. HHC’s stated purpose was to provide comprehensive physical and mental health services and facilities to the ill and infirm, “particularly to those who can least afford such services” (McKinney’s Uncons Laws of NY § 7382; HHC Act § 2). This is compatible with the State’s constitutional mandate to protect and promote the health of inhabitants and to care and treat persons suffering from mental disorder or defect (NY Const, art XVII, §§ 3, 4).
The HHC Act provided the authority for the transfer of New York City health care facilities to HHC for the purpose of maintaining and operating them (McKinney’s Uncons Laws of NY § 7386; HHC Act § 6). According to plaintiffs, HHC assumed responsibility for the Facility’s operation in 1985.
On September 10, 1998, Dr. Luis R. Marcos, president of HHC, ordered the temporary evacuation and transfer of the residents of the Facility, after having been advised that structural deterioration of the Facility buildings represented an emergency condition which threatened the safety of residents, staff and visitors. He advised the Commissioner of the New York State Department of Health (DOH) as to his decision to evacuate and transfer the residents to other facilities. On September 18, 1998, inspectors from the Department of Buildings (DOB) inspected the building facades, finding some problems with building No. 1. Thereafter, an architectural and engineering firm and a construction company conducted probes of the exterior facades, which, it is alleged, revealed significant structural deterioration which necessitate large-scale and expensive repairs. On October 7, 1998, Dr. Marcos notified *804 DOH that HHC lacked funds to make the necessary repairs; HHC intended to discontinue operation of the Facility, and it requested DOH’s approval of the proposed action. By letter, dated October 9, 1998, DOH’s Deputy Commissioner accepted the decision to transfer the residents, observing that “review of the subsequent engineering report, provided by HHC, identified serious deterioration of the building structure, as well as an old structure which fails to meet current life [sic] safety and environmental codes. It is apparent that to repair the building and bring it into compliance will take more than 30 days.”
On October 28, 1998, after a daytime inspection of the Facility, DOB’s Queens Borough Commissioner issued four emergency declaration forms, with notice to the City, as property owner, which were distributed to DOB and Department of Housing Preservation and Development (HPD) officials. Later the same day, the Borough Commissioner annotated copies of the emergency declaration forms to set forth his recommendation that the Facility buildings be demolished, without any option for the buildings to be repaired.
On October 30, 1998, HHC’s Board of Directors adopted a resolution which authorized the discontinuance of operations at the Facility, subject to compliance with Federal, State and local law.
Procedural Background
Plaintiffs commenced this action for declaratory judgment relief against the Mayor, HHC and the City Department of Parks (Parks Department) by the filing of a summons and complaint on October 30, 1998. Simultaneously, plaintiffs moved for a preliminary injunction, prohibiting defendants from surrendering or transferring any ownership interest, lease or sublease, or from demolishing all or part of the Facility, or otherwise making it uninhabitable or unfit for its existing purposes. Defendants cross-moved to dismiss, alleging that plaintiffs lacked legal capacity and requisite standing, the action was not ripe for judicial review, and the complaint failed to state a cause of action.
On October 30, 1998, this court issued a temporary restraining order, precluding demolition of the Facility. Thereafter, plaintiffs amended the complaint, adding as named defendants, Luis R. Marcos, as the president of HHC, DOB, the Parks Department, HPD, and the City of New York, and seeking both a declaratory judgment and injunctive relief. Following submission of the motion and cross motion, pursuant to a stipulation *805 dated January 6, 1999, the parties agreed that the motion would be applicable to all defendants named in the first amended complaint and would also seek summary judgment relief. It was further agreed that defendants’ cross motion would be deemed as having been made by all named defendants in the first amended complaint, would be directed against all causes of action therein, and would include a request for summary judgment, declaring that plaintiffs had no statutory role in connection with the decision to demolish the Facility or HHC’s surrender of use and occupancy of the Neponsit property.
The first amended complaint alleges that, in September 1998, the Mayor caused the frail and elderly residents of the Facility to be removed and dispersed among other health care facilities. It is alleged that the Mayor announced his intention to close the Facility and for HHC to surrender its leasehold interest to the City for the purpose of demolishing the buildings and transferring the land to the Parks Department. It is claimed that DOB’s finding of an emergency situation, which required demolition of the Facility buildings, is a mere subterfuge for the Mayor’s plan to disengage the City from the municipal health care system.
The first cause of action alleges that, pursuant to McKinney’s Unconsolidated Laws of NY § 7387 (4) (HHC Act § 7 [4]), HHC may not surrender use and occupancy of any health care facility, without the express approval and consent of the Board of Estimate. Taking cognizance of the fact that the Facility is a health care facility, within the meaning of the HHC Act (McKinney’s Uncons Laws of NY § 7383 [12]; HHC Act § 3 [12]), plaintiffs argue that, as a consequence of the abolition of the Board of Estimate in 1989, the Board’s power to approve any transfer or surrender of use and occupancy of HHC facilities devolved upon the City Council, as the City’s legislative body, in accordance with the powers conferred in the revisions to the New York City Charter. They claim that the Mayor intends to demolish the buildings and transfer the Facility property without first obtaining the approval of the City Council and, in support, note that, on October 29, 1998, HHC approved surrender of its sublease.
The second cause of action alleges that, in accordance with a 1906 statute (L 1906, ch 456), the Council, as successor to the Board of Estimate, is empowered to decide whether to permit the Facility to be continued as a health care facility, or to allow *806 the property to revert to parkland. Plaintiffs contend that defendants improperly seek to usurp the decision-making power of the Council, reflected by the Mayor’s announcement that the Facility will be demolished and the property conveyed to the Parks Department.
In the third cause of action, it is alleged that any decision to destroy the Facility buildings and use the property as a park must be subject to New York City’s ULURP (NY City Charter §§ 197-c, 197-d). It is claimed that demolition will deprive the community, the City Planning Commission and the City Council of the exercise of their respective rights to review any change in the use of the Facility property.
In terms of relief, plaintiffs seek declaratory judgment and injunctive relief (1) that HHC’s surrender of use and occupancy of the Facility requires City Council approval, as the official body now authorized to determine whether the Facility should continue as a health care facility or be closed and the property permitted to revert to parkland; (2) that defendants’ threatened action, in the absence of a prior ULURP application, is unlawful; (3) enjoining the surrender, sale, lease, conveyance or transfer of the Facility without the consent and approval of the City Council; (4) enjoining the demolition of the Facility, or otherwise rendering it unusable, pending an appropriate determination by the City Council as to its continued use as a health care facility; (5) enjoining defendants from any action which would negate any powers or rights of the Council under the HHC Act or the 1906 statute; and (6) enjoining defendants from any action and directing them to prevent any demolition or further deterioration of the Facility.
Lack of Standing and Capacity to Sue
At the outset, the issues of lack of capacity and standing must be considered (see, Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 9). On the one hand, legal capacity relates to a litigant’s power to appear and bring a grievance before the court, whereas the issue of legal standing is an element of the much larger question of “justiciability.” The latter relates to whether the party seeking relief has a sufficiently cognizable stake in the outcome so as to “cast[ ] the dispute ‘in a form traditionally capable of judicial resolution.’ ” (Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 772-773, quoting Schlesinger v Reservists to Stop War, 418 US 208, 220-221; see also, Community Bd. 7 v Schaffer, 84 NY2d 148, 155.)
Defendants claim that the City Council never voted to authorize the commencement of this action at a duly convened meet *807 ing, held at a stated session and, therefore, it may not appear as a party plaintiff. They also argue that, assuming that the Council may appear, it lacks capacity to seek injunctive relief, since, as a governmental body, it possesses legislative, not executive powers. According to defendants, plaintiffs may not challenge the determination of Marcos and HHC to transfer Facility residents, nor may they contest DOB’s decision to demolish the Facility buildings. Additionally, they claim that Mr. Vallone, as Speaker, as well as Committee Chairpersons Berman and Robles, have sustained no injury as a consequence of any determination by either Dr. Marcos or HHC and, accordingly, they likewise lack requisite standing.
It is conceded that the Council did not vote, nor did it affirmatively authorize the institution of this action. As far as appears, it was the Speaker who directed the Council’s General Counsel to seek judicial relief when it became apparent that DOB intended to demolish the Facility. Under the New York City Charter, when the City Council adopts a local law or resolution, it must act by a majority vote, except as otherwise provided by law (NY City Charter § 34). It is the Speaker, as Majority Leader, who acts as chief executive officer and manages the affairs of the Council. He is chosen by majority vote at the beginning of each legislative session and it is he who is responsible for the Council’s day-to-day operations (NY City Charter § 44; NY City Council Rule § 2). Thus, it is the Speaker who hires staff members, who serve at his pleasure and perform a variety of functions at his direction. By necessary implication, the Speaker is vested with the authority to direct the General Counsel to commence or defend any action on behalf of the Council, which is deemed necessary to effectuate its responsibilities and to protect and ensure its rights and powers (see, Community Bd. 7 v Schaffer, supra, 84 NY2d, at 156; Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436). This is especially so where, as here, the litigation relates to the extent to which one branch of City government may exercise power in relation to another (see, Saxton v Carey, 44 NY2d 545, 551).
Furthermore, nothing in the Charter requires the adoption of a local law or resolution prior to authorization to the General Counsel to commence an action on behalf of the Council, nor does the Charter limit the power of the Speaker to institute an action in the name of the Council (cf., NY City Charter § 93 [i]; § 394 [c]; § 395). Robles and Berman, who are both members of the City Council, as well as Chairpersons of two of its com *808 mittees, have joined the Speaker, all in their official capacities. As far as appears, none of the other members of the Council has objected to the action, nor would any protest be relevant in any event.
Not without significance is that the Speaker has directed the commencement of other actions on behalf of the Council, notwithstanding the absence of specific authorization by express City Council vote. In Council of City of N. Y. v Giuliani (172 Misc 2d 893, affd as mod 231 AD2d 178, affd 93 NY2d 60), both the Mayor and the City appeared as party defendants, without any objection raised as to legal capacity in relation to the appearance of the City Council as party plaintiff. Thus, it has been suggested that the Mayor has overlooked any purported lack of capacity when it has suited some other purpose to do so. (See, e.g., City of New York v State of New York, 168 Misc 2d 750 [the Mayor joined with the City Council as a party plaintiff, notwithstanding the absence of any City Council vote to approve commencement of the action].) In my view, it is palpably clear that the absence of a City Council vote, in terms of authorizing the commencement of this action, does not furnish a valid or appropriate basis to dismiss the complaint for lack of legal capacity.
To the extent defendants rely upon Raines v Byrd (521 US 811) to support their argument that the Speaker and Chairpersons Berman and Robles lack requisite standing, the decision is inapposite here. In Raines, the United States Supreme Court determined that six members of Congress lacked standing to challenge the constitutionality of the Federal Line Item Veto Act (2 USC §§ 691, 692). The Court found that plaintiffs had failed to meet the Federal prerequisite for standing, which required a showing of a personal, particularized, concrete and otherwise judicially cognizable injury (see, Raines v Byrd, supra). In terms of State law, however, the New York Court of Appeals has distinguished the standing requirement in Federal actions from that in State court proceedings, observing that Federal standing is “grounded in the Federal constitutional requirement of a case or controversy * * * a requirement that has no analogue in the State Constitution” (Society of Plastics Indus. v County of Suffolk, supra, 77 NY2d, at 772; see also, Silver v Pataki, 179 Misc 2d 315).
In addition, in Raines v Byrd (supra), the United States Supreme Court took into account that alternate remedial means were available in the form of either legislative action or an action by private individuals who sustained some injury as *809 a result of the Line Item Veto Act. Here, however, there are no private persons who could proceed. Rather, it is the plaintiffs who seek to protect their right to take official action as to the future of the Facility, and it is they who claim a denial of a right to proceed in terms of their official responsibilities.
Clearly, plaintiffs have a direct interest as effective representatives in terms of their official duties and the discharge of their responsibilities. It is equally clear that they have an immediate stake in the outcome of the case, which seeks a delineation of the powers to be accorded to the legislative branch in relation to those sought to be exercised by the executive branch. (See, Coleman v Miller, 307 US 433 [the Court held that Kansas State legislators had standing to challenge the legitimacy of the deciding vote by the Lieutenant Governor, the presiding officer of the Kansas State Senate, since the injury by the legislators amounted to a nullification of their voting power].) Plainly, private individuals have a far less immediate stake in terms of the jurisdictional dispute between the governmental branches in our case (see, Note, Standing in the Way of Separation of Powers: The Consequences of Raines v. Byrd, 112 Harv L Rev 1741 [1999]).
In my view, in terms of standing, the issue whether the City Council is empowered to act with respect to the surrender and demolition of the Facility may be raised, as it has been, in this action. Essentially, it is claimed that the power of the Board of Estimate devolved upon the City Council, which, it is alleged, has been denied the right to vote as to the future of the property, and has thereby been prevented from properly functioning within the authority conferred under the HHC Act, the 1906 statute and ULURP (see, Caruso v New York City Police Dept. Pension Funds, 136 AD2d 266, 275; Silver v Pataki, supra; Matter of Arthur v Griffin, 157 Misc 2d 271).
Accordingly, that branch of the cross motion for summary judgment dismissing the amended complaint upon the ground of lack of standing and capacity to sue is denied.
Judicial Review
Defendants contend that the issues are not ripe for judicial review since HHC has not officially decided to surrender the property to the City, but rather, has only determined to cease operating the Facility as a nursing home as a result of the potential expense of repairing the buildings. Thus, it is argued that, in the future, HHC may still determine not to surrender use and occupancy and, ultimately, may propose an entirely different plan as to the future of the site.
*810 It has been recognized that a declaratory judgment is unavailable when the existence of a dispute is contingent upon the happening of future events, which are beyond the control of the parties and may never occur (see, Cuomo v Long Is. Light. Co., 71 NY2d 349, 354; American Ins. Assn. v Chu, 64 NY2d 379, 385, appeal dismissed and cert denied 474 US 803; New York Pub. Interest Research Group v Carey, 42 NY2d 527, 531; Phoenix Tenants Assn. v 6465 Realty Co., 119 AD2d 427, 430). The rule serves to preclude the issuance of an advisory opinion, which dissipates judicial resources and devalues the force of judicial decrees (see, Cuomo v Long Is. Light. Co., supra).
With respect to plaintiffs’ claim in terms of usurping of the Council’s authority under the HHC Act, McKinney’s Unconsolidated Laws of NY § 7387 (4) (HHC Act § 7 [4]) provides: “If the corporation determines that the use and occupancy of any real property is no longer required for its corporate purposes and powers, then if such real property was acquired at the cost and expense of the city, the corporation shall, subject to the provisions of section five, paragraph six, [section 7385 (6) of McKinney’s Uncons Laws of NY] have power to surrender its use and occupancy to the city. The corporation shall, subject to the provisions of section five, paragraph six, have power to sell, lease or otherwise dispose of said real property at public or private sale or as part of a contract, lease or other agreement entered into under the terms of this act and to use the proceeds derived from the sale, lease or other disposition thereof for its corporate purposes.”
McKinney’s Unconsolidated Laws of NY § 7385 (6) (HHC Act §5 [6], as amended by L 1969, ch 1017) provides, in part, as follows:
“The corporation shall have the following powers in addition to those specifically conferred elsewhere in this act * * *
“6. To acquire, by purchase, gift, devise, lease or sublease, and to accept jurisdiction over and to hold and own, and dispose of by sale, lease or sublease, real or personal property, including but not limited to a health facility, or any interest therein for its corporate purposes; provided, however, that no health facility or other real property acquired or constructed by the corporation shall be sold, leased or otherwise transferred by the corporation without public hearing by the corporation after twenty days public notice and without the consent of the board of estimate of the city.”
Section 7387 contemplates that, at the outset, HHC should determine whether it needs to continue use and occupancy of *811 the Facility property for its corporate purposes and power. In accordance with section 7384 (3) (HHC Act § 4 [3], as amended by L 1970, ch 38), HHC may proceed only by the vote of a majority of directors present at a meeting at which a quorum is in attendance. As applied here, the resolution adopted by HHC’s Board of Directors on October 30, 1998 authorized its president to discontinue operations at the Facility, subject to compliance with Federal, State, and City statutory and regulatory requirements. Although the resolution lacked any mention of a surrender of Facility property, this may be considered ancillary to the determination to no longer use or occupy the property.
A surrender is an express or implied agreement to terminate a legal relationship between the parties in terms of particular property. In the usual situation, a surrender is accomplished by agreement, although it may also be achieved by operation of law when the parties, by their actions, indicate that they consider that a surrender has been made or effected (see, 2 Dolan, Rasch’s Landlord and Tenant — Summary Proceedings § 26:6, at 285-286 [4th ed]).
On this record, it is clear that HHC transferred the residents and staff and stopped using the Facility prior to passage of the HHC Board resolution. It is undisputed that Dr. Marcos told DOH that HHC lacked the funds necessary to repair the Facility for its continued use as a nursing home. Nor did he express any intention or desire to utilize the buildings or property for any other HHC corporate purpose. Also undisputed is that DOB has determined that the buildings are unfit for occupancy as a result of damage to the facades caused by sand, wind and salt air (see also, Real Property Law § 227). Nor has HHC taken any steps to stop, protest or otherwise challenge this determination (see, Administrative Code of City of NY § 26-127 [e]). Instead, HHC has joined DOB in support of the demolition order. Further, the Mayor, who has appointive dominion and control over HHC’s Board of Directors,* has publicly announced (through his spokesperson) that he favors turning the property into parkland (see, City to Tear *812 Down Queens Nursing Home for Parkland, NY Times, Oct. 29, 1998, section B, at 3, col 1; Site of Shut Home to Become a Park, NY Daily News, Oct. 29, 1998, at 40). And, lastly, HHC’s desire to exit from the public health care business is well known and has been recognized (see, Council of City of N. Y. v Giuliani, 172 Misc 2d 893, affd as mod 231 AD2d 178, affd 93 NY2d 60, supra).
Under the circumstances, in my view, it is plain that the issue as to the necessity of City Council approval, pursuant to section 7387 of McKinney’s Unconsolidated Laws of NY (HHC Act § 7), prior to the City’s exercise of complete dominion and control over the property, is ripe for judicial disposition. Similarly, the issues whether, in accordance with the 1906 statute and ULURP, City Council approval is necessary prior to the demolition of the Facility and reversion of the property to parkland, likewise pose justiciable issues, which, on this record, are ripe for judicial resolution.
As has been explained by the DOB Borough Commissioner, the City has been directed to demolish the Facility buildings. It is contended that any contemplated DOB action would usurp the Council’s authority in terms of the future of the Facility under both the 1906 statute and ULURP. The 1906 statute, it is argued, grants to the Board of Estimate and, by its abolition, to the City Council as necessary successor, the power to decide whether to make necessary repairs and continue use of the Facility property as a health care facility, operated by a charitable or benevolent society. It is also urged that ULURP is applicable to the demolition of the buildings and to the transfer of the property to the Department of Parks as a “disposition of the real property of the city” (NY City Charter § 197-c [a] [10]) and that the ULURP procedures have not been complied with here.
In contrast, defendants take the position that the DOB Borough Commissioner is vested with broad discretion to protect the public safety, with final authority in terms of the demolition of a building, as long as the determination has a rational basis and is neither arbitrary nor capricious. It is further argued that ULURP is inapplicable here, since there is no disposition of the Facility property by virtue of the planned demolition and transfer from the City to an agency of the City. However, once demolition occurs, the issue as to the Council’s power, if any, under the 1906 statute and/or ULURP, in terms of the future of the Facility, will be rendered academic. Clearly, there is a genuine controversy here as to which party has the *813 ultimate authority or some active role in terms of the future of the buildings and to what extent the parties act in conjunction with each other. Therefore, in my view, the case does pose critical and significant issues which are ripe for judicial disposition.
Accordingly, so much of the cross motion as seeks summary judgment dismissing the amended complaint on that ground is denied.
The HHC Act
Section 7383 (12) of McKinney’s Unconsolidated Laws of NY (HHC Act § 3 [12]) defines a “health facility” as a “building, structure or unit or any improvement to real property * * * including, but not limited to, a * * * nursing home * * * constructed, acquired or otherwise provided by or for the use of the corporation or the city in providing health and medical services to the public.” Section 7387 (HHC Act § 7) expressly provides that HHC’s power to surrender use and occupancy of real property to the City is subject to the provisions contained within section 7385 (6) (HHC Act § 5 [6]). Section 7385 (6) affords HHC the power to dispose of property by sale, lease or sublease, provided that no health facility or real property acquired by HHC may be sold, leased or “otherwise transferred by the corporation without public hearing by the corporation * * * and without the consent of the board of estimate.” (Emphasis added.)
Defendants do not contest that the Facility is a health facility, within the meaning of section 7383 (12). They do contend, however, that a surrender to the City of the use and occupancy of the property does not amount to a sale, lease or transfer of the property within the terms of section 7385 (6). They claim that, although a conveyance of title or an assignment of a lease is a transfer of real property, the term does not include a surrender of use and occupancy. In support of their position, defendants point to the fact that, in the past, the City did accept the surrender of property from HHC, including hospitals, parking lots and vacant land, each without seeking to obtain the approval of the Board of Estimate. They argue that this should furnish some guidance as to the appropriate construction to be accorded sections 7387 and 7385 (6) of McKinney’s Unconsolidated Laws of NY.
It is recognized that prior history is of some relevance in terms of the construction of a statute where the interpretation *814 of the statute is by an administrative agency (see, Matter of Fineway Supermarkets v State Liq. Auth., 48 NY2d 464; Matter of Sigety v Ingraham, 29 NY2d 110). Here, however, the interpretation of sections 7387 and 7385 (6) of McKinney’s Unconsolidated Laws of NY does not derive from any special competence or expertise of DOB, Parks Department, HPD or HHC (see, Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 NY2d 588, 597; Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459). Moreover, it appears that, in the past, HHC has taken the position that the surrender of use and occupancy of property is necessarily subject to at least one of the two provisos contained in section 7385 (6) of McKinney’s Unconsolidated Laws of NY (HHC Act § 5 [6]). The record on this motion includes proof that, prior to the abolition of the Board of Estimate, HHC did conduct public hearings as to the surrender of use and occupancy of property, with explicit reference to section 7385 (6) as the underlying basis for the hearings. Inasmuch as the requirement for such a public hearing arises out of section 7385 (6), HHC’s prior practice does support plaintiffs’ position that a surrender of use and occupancy amounts to a transfer, within the terms of the “otherwise transferred” language contained in section 7385 (6).
In the alternative, defendants assume the position that section 7387 of McKinney’s Unconsolidated Laws of NY (HHC Act § 7) only requires compliance with the applicable provisions of section 7385 (6), in terms of a surrender of use and occupancy of real property. Thus, while they concede that section 7385 (6) does require that HHC conduct a public hearing, it is argued that the statute should not be interpreted to require the approval of any alleged successor to the Board of Estimate, since to do so would be “illogical.”
To the contrary, it is conceivable that there may be instances where the surrender of use and occupancy might be unacceptable to the Council, as alleged successor to the Board of Estimate. For example, the leased property might be in poor condition as a consequence of some damage or shoddy repairs by HHC, and it might be both reasonable and appropriate to consider some form of compensation as a condition to any such surrender. Alternatively, the leased property could entail a certain level of expense in relation to continued maintenance and upkeep, to such an extent that it might be preferable that HHC exercise its power to sell, lease or sublease the property (see, McKinney’s Uncons Laws of NY § 7385 [6]; § 7387) in lieu *815 of any surrender to the City. Plainly, there are other possible scenarios which might impede any such determination.
It is not this court’s responsibility, however, to speculate as to the reason for the Legislature’s choice of the term “provisions” as opposed to the phrase “applicable provisions,” or some other variation of statutory language when enacting the first sentence of section 7387 of McKinney’s Unconsolidated Laws of NY (HHC Act § 7). Rather, since the word appears in its plural form, it must be construed according to its plain and ordinary meaning, necessary to give effect to the expressed legislative intent. Section 7385 (6) of McKinney’s Unconsolidated Laws of NY (HHC Act § 5 [6]) sets forth two provisions, namely, the conduct of a public hearing and the securing of Board of Estimate approval. Inasmuch as section 7387 states that any surrender of use and occupancy is subject to the provisions (as opposed to a provision) of section 7385 (6), plainly, section 7387 mandates compliance with both provisos in section 7385 (6), relative to a public hearing and consent of the Board of Estimate.
The issue whether the approval power conferred upon the Board of Estimate by section 7385 (6) has devolved upon any entity, including the City Council, in light of the abolition of the Board of Estimate, was previously raised in Council of City of N. Y. v Giuliani (172 Misc 2d 893, affd as mod 231 AD2d 178, affd 93 NY2d 60, supra). In that case, plaintiffs had challenged the privatization of targeted public hospitals, which had been operated by HHC, by means of subleases entered into by HHC with private institutions. They claimed that HHC lacked statutory authority to sublease the hospitals, and that the subleasing of such facilities was subject to ULURP and required the approval of the Mayor and the City Council, in accordance with section 7385 (6) of McKinney’s Unconsolidated Laws of NY (HHC Act § 5 [6]). In opposition, defendants asserted that HHC had the statutory authority to sublease the hospitals, and that the decision was not subject either to ULURP or to the approval of the City Council.
As far as appears, the issue as to whether City Council approval was required as a condition of HHC’s determination to sublease the hospitals was never resolved in Council of City of N. Y. v Giuliani (supra). The Appellate Division, Second Department, determined that HHC’s transfer to a private entity of the statutory obligation to operate a City hospital was not authorized by the HHC Act (231 AD2d 178, supra). It also *816 determined that the Supreme Court should have dismissed the other two claims advanced by plaintiffs in relation to the applicability of ULURP and the necessity of City Council approval of the sublease. Thus, in modifying the order and judgment, the appellate court did not reach the issue of the devolvement upon the City Counsel of the approval power of the former Board of Estimate. Nor was the issue passed upon by the Court of Appeals when it affirmed the Appellate Division determination (93 NY2d 60, supra). In affirming, the Court of Appeals concluded that the proposed sublease was not authorized by the HHC Act and that, as a consequence, the remaining claims should not have been considered.
In contrast, here, the statutory authority according to HHC the power to surrender use and occupancy of City property is clear. As a consequence, the issue whether the City Council, as successor to the Board of Estimate, retained the power to approve such a surrender is squarely presented. As noted, in my view, the consent power has not been rendered obsolete by the abolition of the Board of Estimate, but rather, by implication, has devolved upon the City Council.
The Board of Estimate was abolished, and its power distributed elsewhere, as part of sweeping Charter amendments proposed by the New York City Charter Revision Commission (see, Final Report of NY City Charter Rev Commn [Jan. 1989-Nov. 1989]), which were enacted by the voters at the November 7, 1989 general election. The New York City Charter Revision Commission had been formed following the determination by the Federal court in Morris v Board of Estimate (592 F Supp 1462 [ED NY 1984], affd 831 F2d 384, affd 489 US 688 [1989]), which had held that the voting distribution of the Board of Estimate members was violative of the constitutional requirement of one person, one vote. The Commission, in making its proposals to amend the Charter to address the issue of voting distribution, also had as one of its objectives to build greater community participation in policy debates and decisions (see, Final Report of NY City Charter Rev Commn, at 4 [Jan. 1989-Nov. 1989]). Therefore, it proposed that those governmental decisions relative to land use effects be made by the City Council under the Charter revisions.
Notwithstanding the adoption of the Charter amendments of 1989, the New York State Legislature has never acted to amend section 7385 (6) to delete the phrase “board of estimate,” nor to substitute a specific officer or body for the Board of Estimate in relation to the consent power. As a result, the *817 phrase “board of estimate” remains part of the language of section 7385 (6). That the Legislature has left the obsolete phrase to remain part of the statute, rather than eliminate it, may be a viewed as a legislative determination to permit the consent power to devolve upon the body, agency or officer designated in the revised Charter to succeed to the powers of the Board of Estimate.
The Charter itself anticipates this result. Section 1152 (e) of the Charter, in pertinent part, provides that: “the powers and responsibilities of the board of estimate, set forth in any state or local law, that are not otherwise devolved by the terms of such law, upon another body, agency or officer shall devolve upon the body, agency or officer of the city charged with comparable and related powers and responsibilities under this charter, consistent with the purposes and intent of this charter.” This section grants the powers of the Board of Estimate under McKinney’s Unconsolidated Laws of NY § 7385 (6) to the “body, agency or officer” charged with comparable and related powers and responsibilities under the Charter.
Defendants contend that, under the Charter, the Mayor, not the City Council, inherits the role of the Board of Estimate under section 7385 (6). In support of this contention, they rely upon section 384 (a) of the Charter, which provides as follows: “No real property of the city may be sold, leased, exchanged or otherwise disposed of except with the approval of the mayor and as may be provided by law unless such power is expressly vested by law in another agency.”
Plaintiffs assert that under the ULURP provisions of the Charter, the power to approve the surrender pursuant to the HHC Act is vested in the Council. They cite section 197-c (a) (10) of the Charter which provides:
“Except as otherwise provided in this charter, applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation shall be reviewed pursuant to a uniform review procedure in the following categories * * *
“(10) Sale, lease (other than the lease of office space), exchange, or other disposition of the real property of the city.”
Notwithstanding the foregoing, these Charter provisions all relate to the disposition or relinquishment of control of City real property, whether permanently or pursuant to a lease term. In our case, however, HHC is attempting to return the *818 Facility to the control of the City, in contrast to the removal of the property from the City’s control. Clearly, the surrender of use and occupancy of the Facility will require a determination as to its new use and such determination, under ULURP, would be within the province of both the City Planning Commission and the City Council. Under such circumstances, it is palpably clear that the body charged by the Charter with the powers and responsibilities which are “comparable and related” to the approval power which the Board of Estimate possessed, under section 7385 (6) of McKinney’s Unconsolidated Laws of NY (HHC Act § 5 [6]), is the City Council.
The 1906 Statute
Plaintiffs also claim that the City Council has been vested with the power to decide the fate of the Facility under the 1906 statute. The 1906 statute, in pertinent part, provides as follows: “§ 4. The board of estimate and apportionment of the city of New York shall have power whenever it shall have appropriated a sum which shall be sufficient in its judgment for the erection, maintenance and support of a hospital or hospitals to be erected in said seaside park to withdraw from the jurisdiction of the park department as much of said seaside park as it shall deem proper, and to confer jurisdiction over the same upon the board of health or the board of trustees of Bellevue and allied hospitals or the commissioner of public charities, and to permit the use by said board or commissioner of the part of said park so withdrawn. With the approval of the sinking fund commission the board of estimate and apportionment shall also have power, whenever it shall deem it to [be in] the public interest, to withdraw from the jurisdiction of said park board such portion or portions of said property, and to allow the use of the portion or portions so withdrawn for a period of thirty years, with the privilege of renewals for periods of twenty years, by any charitable or benevolent society of the city of New York that will erect a convalescent hospital or hospitals, and provide for the care therein of residents of the city of New York, provided said building or buildings are so located and constructed as in the judgment of the board of estimate and apportionment shall not disfigure said park or interfere with the purposes of public use and recreation.”
In 1936, the voters approved a major overhaul of the old Charter. As a consequence, the State Legislature enacted chapter 929 of the Laws of 1937, which revised an earlier ver *819 sion of the City’s Administrative Code and certain State laws, inter alia, to harmonize the existing laws with the new Charter. As part of this enactment, several statutes which related to the City were repealed, including the 1906 statute. The 1937 enactment, however, did include a savings provision as follows: “Any provision of any statute applicable to the city or any part thereof, now or hereafter enacted, imposing functions generally, specifically or by devolution, upon any agency, which is not identified in the city by the designation provided in such statute, shall be deemed to have imposed such functions upon any agency of the city or part thereof, to which has been transferred the functions of the designated agency or which exercises similar functions, or in the absence of such agency, upon the hoard of estimate.” (Former Administrative Code § 982-5.0 [emphasis added].)
Plaintiffs contend that the powers of the Board of Estimate, in terms of land use decisions related to land already acquired and dedicated to park or hospital use prior to the 1937 enactment, were not restricted by the repeal of the 1906 statute. In support, they rely upon the savings provision of the 1937 statute and Aldrich v City of New York (208 Misc 930, supra).
In Aldrich (supra), members of the Board of Directors of the Park Association of New York City, Inc., a nonprofit corporation, which was dedicated to the preservation of City parks and playgrounds, commenced an action to enjoin the Board of Estimate from selling the Neponsit Beach Hospital property to private developers. The Aldrich court determined that the property could not be sold, but rather, was to be devoted to use as a park, hospital, or some other public purpose. In reaching this determination, however, the court did not pass upon the issue raised by the Park Association Board members that the 1906 statute had not been repealed. Instead, it was held that, assuming that the 1906 statute had been repealed, this did not absolve the City from the trust impressed upon the entire tract of land, nor did it confer the authority to sell the Neponsit Beach Hospital property. The court further ruled that the public’s right in the land, which was acquired pursuant to the authority conferred by the 1906 statute, vested prior to the statute’s repeal, and could not be affected by the absence of special legislation. Thus, the decision in Aldrich supports the legal conclusion that the Board of Estimate retained the power to decide the use of the Facility, compatible with the uses originally contemplated by the Legislature under the 1906 statute.
*820 Moreover, the history of the use of the Facility and the various resolutions of the Board of Estimate, from the 1937 repeal to 1985, when HHC assumed operation of the Facility, is consistent with plaintiffs’ interpretation as to the savings provision of the 1937 enactment. On June 29, 1950, the Board of Estimate adopted a resolution which accepted the surrender by the Commissioner of Hospitals of a small portion of the hospital property to the New York City Fire Department, which was to be the site of a new fire station (see, calendar No. 175 of Bd of Estimate, dated June 15, 1955, citing calendar No. 118 of Bd of Estimate, dated June 29, 1950). By resolution of the Board of Estimate, dated April 21, 1955, the Board of Estimate accepted the surrender of the entire hospital property from the Commissioner of Hospitals, exclusive of that portion assigned to the Fire Department {id., citing calendar No. 144 of Bd of Estimate, dated Apr. 21, 1955). On July 21, 1955, the Board of Estimate defeated a resolution which had attempted to transfer the Neponsit Beach Hospital to the City Parks Department. The Neponsit Beach Hospital was closed in 1955. Subsequently, on October 25, 1956, approximately four and one-half acres of the Neponsit Beach Hospital property were transferred by the Board of Estimate to the Department of Welfare for the care of the aged. The 10 remaining acres were transferred to the Parks Department {see, calendar No. 236 of Bd of Estimate, dated Oct. 25, 1956). And, on May 23, 1957, the Board of Estimate rescinded its decision of October 25, 1956, and approved the lease of the Neponsit Beach Hospital to the Department of Welfare, and the remaining property to the Parks Department. The Board of Estimate also rescinded the earlier allotment of property to the Fire Department {see, calendar No. 132 of Bd of Estimate, dated May 23, 1957).
In addition, such interpretation is consistent with the fact that, prior to the 1989 revision of the New York City Charter, the Board of Estimate had “final authority over land use decisions” (Final Report of NY City Charter Rev Commn, at 7 [Jan. 1989-Nov. 1989]; see, Council of City of N. Y. v Giuliani, 172 Misc 2d 893, affd as mod 231 AD2d 178, affd 93 NY2d 60, supra). Under the former Charter, the Council had no role in the land use review process. The seven-member City Planning Commission, appointed by the Mayor, with the advice and consent of the Council (except for the Chairperson, who served at the pleasure of the Mayor), initially passed upon significant land use decisions, but the Board of Estimate had the power to approve, modify or disapprove such decisions. The 1989 *821 Charter amendments substituted the City Council for the Board of Estimate as the final decisionmaker as to such land use questions.
Upon the foregoing, it is concluded that the City Council does have the power under the HHC Act, the ULURP provisions of the Charter and the savings provision of the 1937 enactment to determine, in terms of approval, the fate of the Facility property.
The Demolition Order
Article 8 of title 26 of the Administrative Code grants to the City Commissioner of Buildings broad authority to act whenever an unsafe building poses a threat to public safety (see, East 13th St. Homesteaders’ Coalition v Wright, 217 AD2d 31). Nevertheless, such authority is not without limitation (see generally, 51 St. Nicholas Realty Corp. v City of New York, 218 AD2d 343). Under the Administrative Code, in an emergency situation, the Commissioner may serve the owner, executor, administrator, agent, lessee, or other person who has a vested or contingent interest in the structure or premises, with a notice and order requiring that the structure be removed (see, Administrative Code § 26-236). Upon refusal or failure to comply with the order, a survey must be conducted by the Superintendent, a licensed architect appointed, either by the county chapter of the American Institute of Architects of the borough in which the survey is to be made, or by the New York Society of Architects, Brooklyn Society of Architects, or a licensed professional engineer appointed by the New York Association of Consulting Engineers or by the county chapter of the New York Society of Professional Engineers of the borough in which the survey is to be made; and a practical builder, a licensed professional engineer or a licensed architect appointed by the person served with a notice pursuant to section 26-236 of the Administrative Code (see, Administrative Code §§ 26-236, 26-238). If the report of the surveyors states that the premises are unsafe or dangerous, the Corporation Counsel must institute a proceeding before a Justice of the Supreme Court, by the filing of the notice and report of the surveyors. During the proceeding, the issue to be tried is whether the structure or premises is structurally unsafe or dangerous, or dangerous or detrimental to human life or health (see, Administrative Code § 26-239). In the event a verdict or decision is rendered finding the structure or premises to be structurally unsafe or dangerous, or dangerous or detrimental *822 to human life or health, the court must issue a precept, directed to the superintendent, which commands the superintendent to vacate and repair and secure, or repair and secure, or take down or remove the structure or part thereof, in accordance with the verdict or decision (see, Administrative Code § 26-239 [d]).
Again, section 26-236 of the Administrative Code provides that notice be given to certain named persons, namely, the owner, executor, administrator, agent, lessee, or other person who has. a vested or contingent interest in the structure or premises. To the extent that HHC may have a leasehold interest in the Facility property, under that section, it would be entitled to notice of the demolition order and to contest the order through the procedures set forth in the Administrative Code. Notwithstanding the foregoing, HHC has taken no action to act to protect the Facility buildings from demolition, nor has it consulted with the City Council to effectuate the desire on the part of the Council to stop the ordered demolition. When the HHC Board of Directors met on October 30, 1998, two days after the date of the issuance of the demolition order, it voted to cease operations, without addressing the demolition order. Moreover, HHC, in the context of this action, actively supports demolition of the Facility buildings.
Section 26-236 of the Administrative Code, however, cannot be read to limit the providing of notice to only those persons who possess traditional property interests relative to the Facility buildings (cf., East 13th St. Homesteaders’ Coalition v Lower E. Side Coalition Hous. Dev., 230 AD2d 622). To permit the City to demolish the Facility buildings, without first granting the City Council the right to intervene to protest the demolition, would improperly nullify the legislative intention concerning the City Council’s role in terms of approving any surrender by HHC of use and occupancy of City property and, insofar as applicable here, any future use of the Facility property.
Preliminary Injunction
Preliminary injunctive relief is a drastic remedy, which will only be granted if it is established that there is a clear right to the relief under the law and the facts (see, Anastasi v Majopon Realty Corp., 181 AD2d 706, 707; County of Orange v Lockey, 111 AD2d 896). The purpose of a preliminary injunction is to preserve the status quo pending trial (see, Schlosser v United Presbyt. Home, 56 AD2d 615). On such a motion, movant must demonstrate (1) a likelihood of success on the merits, (2) irreparable injury absent the granting of a preliminary injunction, *823 and (3) a balancing of equities which favors the issuance of injunctive relief (see, Montauk-Star Is. Realty Group v Deep Sea Yacht & Racquet Club, 111 AD2d 909; Family Affair Haircutters v Detling, 110 AD2d 745, 747). When denial of injunctive relief would render the final judgment ineffectual, the degree of proof required to establish the element of likelihood of success on the merits should be reduced (Schlosser v United Presbyt. Home, supra).
Under the circumstances of this case, plaintiffs have established their entitlement to summary judgment relief, declaring (1) HHC’s surrender of use and occupancy of the Facility requires City Council approval under the HHC Act, (2) the Council has the right, under the 1906 statute, to determine whether the Facility property is to be used as a hospital, park or other public purpose, and (3) the use of the property is subject to ULURP. Thus, plainly, the equities favor preserving the status quo pending the outcome of an unsafe building proceeding to be brought pursuant to Administrative Code § 26-235 et seq. Further, the demolition of the Facility buildings, without affording the City Council an opportunity to be heard, would render any declaratory relief wholly ineffectual.
Insofar as applicable here, plaintiffs challenge whether the City is using the alleged defective condition of the Facility buildings as a subterfuge, contending that it has already been determined to turn the property into parkland. “[T]he abatement of unsafe or dangerous conditions, which constitute a threat to public health, safety and welfare, by the * * * removal of a structure * * * is an exercise of the municipality’s police power which interferes with the beneficial use of property. It has been stated that ‘a municipal exercise of the police power which interferes with the beneficial use of property must be a reasonable and legitimate response to a situation which it is within the police power to correct’ ” (51 St. Nicholas Realty Corp. v City of New York, 218 AD2d 343, 351, supra, quoting Matter of Charles v Diamond, 41 NY2d 318, 327). Determinations of reasonableness must turn upon the facts and circumstances of a particular case (Matter of Charles v Diamond, supra, at 327). “What is an ‘unreasonable’ exercise of the police power depends upon the relevant converging factors. Hence, the facts of each case must be evaluated in order to determine the private and social balance of convenience before the exercise of the power may be condemned as unreasonable” (French Investing Co. v City of New York, 39 NY2d 587, 596).
In our case, HHC failed to obtain the consent of the City Council in advance of its constructive surrender of the Facility *824 to the City. It further appears that the City has precluded access to any on-site inspection of the Facility buildings by a structural engineer retained by the Council. As a result, the Council has been unable to gather facts sufficient to prepare for an unsafe building proceeding to be brought pursuant to section 26-239 (b) of the Administrative Code. The Council must be given both a reasonable opportunity to conduct an inspection of the Facility and limited discovery as to the structural integrity of the Facility buildings and facades prior to the holding of a hearing in any such unsafe building proceeding. The fact that the Corporation Counsel has not already brought a separate special proceeding, pursuant to section 26-239 of the Administrative Code, is immaterial (see, East 13th St. Homesteaders’ Coalition v Wright, supra; CPLR 103).
Conclusion
Accordingly, the branch of plaintiffs’ motion for summary judgment is granted to the extent of declaring that (1) HHC’s surrender of the use and occupancy of the Facility required the approval of the City Council under the HHC Act; (2) the City Council has the right, under the 1906 statute, to determine whether the Facility property shall be used for a hospital, park or other public purpose; (3) the use of the property is subject to ULURP; and (4) the City Council has the right to contest the demolition of the Facility buildings by an unsafe building proceeding to be held before this court. The branch of the cross motion by defendants for summary judgment, declaring that plaintiff City Council has no statutory role in relation to any decision to demolish the Facility or to HHC’s surrender of use and occupancy of the Neponsit property, is denied. The branch of the motion by plaintiffs for a preliminary injunction, enjoining the demolition of the Facility buildings, is granted. The parties are directed to advise chambers as to a mutually convenient date for a conference to discuss and agree upon an inspection date and a discovery schedule, as well as the scheduling of an unsafe building hearing.

 The HHC Board of Directors is comprised of 16 members. The Chairperson of the Board is designated by the Mayor. Four other members, who serve ex officio, are heads of City agencies, also appointed by the Mayor. Five additional members of the Board are appointed by the Mayor. Five members are designated by the Council. The chief executive officer of HHC is also a director of the Board and is chosen by the other 15 directors (McKinney’s Uncons Laws of NY § 7384 [1]; HHC Act § 4 [1]).