OPINION OF THE COURT
Paul A. Victor, J.
In each of these small claim proceedings[1] the plaintiff seeks to recover the sum of $2,000 which she alleges was given to each of the defendants as a result of misrepresentations and a fraudulent guarantee and inducement made to plaintiff by defendants in connection with a promotional chain-linked “gifting program,” which was established and conducted under the auspices of Network Associates Social Club (hereinafter Network). The defendant, Marlene Terez, having previously been recruited to join the Network program, thereafter recruited others, including the defendant Villacruz and the *852 plaintiff Pacurib. None of the original founders nor any of the promoters of Network have been made a party to these proceedings.
BACKGROUND AND FINDINGS OF FACT
Network is an organization which was founded in the State of New Jersey and professes to be “a private club (by invitation only) of business owners and consumers who get together weekly to expand the business base by networking their products and services at a discount to fellow associates.” However, the testimony and evidence disclosed that its business expansion purpose is merely pretextual and that the club’s 14-page “meeting agenda” booklet, and its regular meetings, are almost entirely devoted to its chain-linked “optional gifting program.” That program was shown to be dependent upon the recruitment of ever-increasing numbers of new members, who by their “voluntary gifts” are alleged “to provide positive cash flow to fellow members for business expenses, debt eradication, medical expenses, back taxes, home purchases, or to fulfill their dreams.” The meeting agenda booklet contains flow charts and is replete with instructions and explanations concerning the gifting program and the “gifting boards” established thereunder.
The “gifting board” presents a four-level, three-step, pyramid with a CEO at the top, two presidents beneath the CEO position, four vice-presidents beneath them, and eight newly recruited members at the bottom. When the “gifting” process is complete and the CEO “retires,” the remainder of the pyramid splits, everyone advances up in rank and two new pyramids are formed, each containing a new CEO and six other officers, all of whom then must actively seek eight new recruits so as to enable the process and new pyramid boards to continue ad infinitum to everyone’s monetary benefit, or so everyone is led to believe. What is presented is thus not a singular ever-expanding pyramid, but one which spawns a chain of multiple ongoing pyramids, each of which are linked to its predecessor. The club, however, apparently in an effort to distance itself from chain distributor pyramid schemes, uses the characterization “gifting board,” rather than pyramid, and provides its own self-serving definition of a pyramid.[2]
In another self-serving declaration the club lectures that “this is not an investment, game or wager;” and it disingenu *853 ously adds that the $2,000 which is “gifted” by the new members is given “without consideration * * * and there is never a promise or guarantee of a monetary return.” Of course, in reality, no one ever joins without the expectation of a windfall profit. In any event, to insure the availability of new members, the club requires that all participants participate in a vigorous recruiting program and it even urges and encourages all members to participate in a “sponsorship program” whereby funds are advanced and/or loaned by the sponsor to those proposed recruits who do not have the funds to join. The booklet explains that “the more new members you invite (and sponsor) to support your board, the faster you (and your sponsored recruit) will move to CEO.” The booklet further advises that all board members as well as CEOs and retired CEOs can be sponsors and recommends that “relatives, out of state friends, and encouraging new members to locate their own sponsors are great ways to fill the boards.”
Regular weekly networking meetings are scheduled in New Jersey by the original organizers of Network Associates, who also provide the facility and refreshments. For services rendered by Network, all retiring CEOs are required “to make a $500.00 donation (to the organizers) from every gifting to host a net working party.” In November of 1998 the plaintiff was recruited by the defendant Marlene Terez who was at that time a retired CEO of a gifting board which had already spawned other boards containing her relatives and friends and other recruits some of whom had apparently been “sponsored” by the defendant Terez. According to the plaintiff and her witnesses, the defendant Terez made an oral promise to proposed recruits (including plaintiff) that if they joined and thereafter did not get sufficient new recruits and/or the program did not work, she would return their money. At least one of these witnesses, who corroborated this promise, was a friend of the defendant Terez, and he had no stake in the outcome, and was not shown to have any motive to testify falsely. His testimony was consistent and credible.
After a number of meetings in New York, where this promise and other representations were made by the defendant Terez, the plaintiff, relying thereon, attended one of the regularly scheduled meetings in New Jersey and became one of the eight new “founders” of a board headed by a CEO named Lita (an *854 aunt of defendant Terez) and Lillian and Alma (as presidents), each of whom were also aunts of defendant Terez. It was at this meeting where plaintiff made a $2,000 “gift” to Lita; and it was at this meeting where plaintiff, for the first time, was given a copy of the Network booklet, which she claimed she did not read. Thereafter, additional “networking parties” were hosted at the suggestion of the defendant Terez, not in New Jersey, as required by Network, but in New York; and it was at these sessions in New York that plaintiff introduced additional recruits (four of whom joined the pyramid). Plaintiff then advanced in rank to the CEO position.. Although she advanced to CEO at the last session, plaintiff was never able to retire as a CEO. Lillian and Alma (the aunts of the defendant Terez), who were “Presidents” when plaintiff first joined the board as a founder, eventually advanced to and retired as CEOs. The defendant Loreana Villacruz (an associate and recruit of defendant Marlene Terez), who was a vice-president when plaintiff first joined the board, also advanced and retired as a CEO. At that last session, the defendant Villacruz, as a retiring CEO, was “gifted” by the new founders, and as a consequence she received $2,000 from one of plaintiff’s recruits and an additional $2,000 from the plaintiff who again joined the same board as a founder for the second time. The defendants, Marlene Terez and Loreana Villacruz, also again appeared as contributing founders together with the others on that last board. However, it appears that they did not contribute any additional funds and were just “listed as founders” in order to complete the board so that Villacruz could retire.
In any event, although plaintiff advanced to the CEO position, she did not receive any funds because no one was able to obtain new investing founders which would allow her to retire and the board to split into two additional pyramids, and thus continue. These proceedings, based on fraud, were subsequently commenced when the defendant Marlene Terez failed, after a demand made by plaintiff, to fulfill her promise to return the funds which plaintiff gifted to the defendants and/or to their relatives and associates. It should be noted that at the trial no evidence was presented by any of the witnesses as to any act of fraud or misrepresentation perpetrated by the defendant Villacruz other than that she was present when defendant Terez made the promise to indemnify proposed recruits. As to the defendant Terez, however, the evidence, albeit parol evidence, established prima facie all of the essential elements of a common-law fraud in the inducement tort cause of action, i.e., *855 representation of a material fact, falsity, scienter, reliance and injury.
CHAIN DISTRIBUTOR SCHEMES
Chain distributor schemes have been legislatively banned in New York and most of the United States because they are deceptive and because, for most participants, success is impossible and a loss of funds is all but guaranteed. Nothing in this decision should be construed as an opinion by this court as to the legality or illegality of the Network program under the laws of the State of New Jersey. In any event, the Network program, like all chain distributor schemes, is doomed to ultimately fail since the continued existence of such a scheme is dependent upon reaching and convincing an ever-increasing number of new participants which are, in reality, not available. The program is deceptive because recruits are led to believe that an unlimited pool of possible recruits are readily available. After a relatively small number of progressions and divisions, a pool of multimillions of persons would be required to provide this voracious amoeba-like pyramid with the number of founders necessary for it to continue to divide and exist.[3]
*856 The seven original organizers, of course, pay no money, and are never at risk. Moreover they receive immediate profits as the program proceeds in its early stages when recruits are readily available. In addition, if they rotate their names and initiate several other versions of the same program, their rewards will multiply well before the pool of available recruits dries up.
For the original eight investing founders, to reach the apex of the pyramid (i.e., in Network to achieve CEO status), the board must progress three levels and 48 new founders must join, making a total of 56 participants. Moreover, in order for these eight investing founders to retire and be paid, the board must progress another level and 64 new founders must join the eight boards headed by these eight CEOs. At this level, a total of 120 paying founders will have participated. Although sufficient possible recruits are available at these early stages of the program, the pool of available people rapidly dissipates as the program progresses. As the chart demonstrates, at the 20th level 4,194,304 new investing founders would be required in order for all previous CEOs to be paid and retire; and at that level a total of 8,388,600 investing founders will have participated. Just to advance one additional level, these 20th-level founders would require an additional 8,388,608 new founders, thus making a total of 16,777,208 participating founders. In addition, consider the staggering number of new recruits which would be necessary for all of these 20th-level founders to advance to the CEO position. Obviously, such a pool of persons would more than exhaust even the largest of the population centers in the United States. Thus, these schemes are doomed to fail, and because of this they are made malum prohibitum throughout most of the United States.
APPLICABLE STATUTORY PROVISION
The Martin Act
In New York, no provision of the law specifically and expressly addresses itself to “pyramid schemes.” However, the Martin Act, which is incorporated in article 23-A of the General Business Law, states that it is “illegal and prohibited for any person * * * to promote, offer or grant participation in a chain distributor scheme.” (General Business Law § 359-fff [1].) The Act, which clearly includes chain-linked pyramid schemes, defines a chain distributor scheme as: “a sales device whereby a person, upon condition that he make an investment, is *857 granted a license or right to solicit or recruit for profit or economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition.” (General Business Law § 359-fff [2].)
An investment, within the meaning of the General Business Law, was originally limited to “any acquisition, for a consideration other than personal services, of property, tangible or intangible, and includes without limitation, franchises, business opportunities and services.” (General Business Law former § 359-fff [2].) Significantly, in 1982 the meaning of the term investment was broadened to include “any other means, medium, form or channel for the transferring of funds, whether or not related to the production or distribution of goods or services” (L 1982, ch 103, § 1). The General Business Law further provides that “[a] limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for such license or right to recruit or solicit or the receipt of profits therefrom, does not change the identity of the scheme as a chain distributor scheme.” (General Business Law § 359-fff [2].)
RIGHT TO A PRIVATE CAUSE OF ACTION
The initial issue to be determined is whether the plaintiff has a cause of action to recover her money either pursuant to express or implied provisions of the Martin Act, or via any other legal theory consistent with substantial justice, including a common-law fraud action and/or an action upon an oral indemnification agreement. It is noted at the outset that there is no provision anywhere in the Martin Act, including section 359-fff, that expressly allows a person or entity, other than the Attorney General of the State of New York, to maintain a cause of action to stay or enjoin or seek penalties or damages for fraudulent, deceitful or other prohibited conduct which violates one of its provisions. It is also noted that no provision of this enactment expressly precludes a cause of action by a private person. In any event, may the right to such a cause of action by a private person be implied under any of the provisions of the General Business Law? Although no New York Court of Appeals case has directly addressed this precise question with regard to General Business Law § 359-fff, the New York Court of Appeals has made it abundantly clear, in cases dealing with other sections of the Martin Act, that no implied private cause *858 of action will be sustained under any of the provisions of that Act. (See, Vermeer Owners v Guterman, 78 NY2d 1114 [1991]; CPC Intl. v McKesson Corp., 70 NY2d 268 [1987].) In Vermeer, a unanimous Court held and stated: “We agree with the courts below that plaintiffs may not maintain a private cause of action under the Martin Act [citation omitted]. Plaintiffs contend that CPC is not controlling because that case involved the violation of General Business Law § 352-c, which addresses a variety of fraudulent acts and practices in the sale and exchange of securities and other properties, whereas the present claim is based upon a violation of section 352-e, which specifically addresses real estate syndication offerings. The difference, however, is not legally significant because our decision in CPC rested on a determination that ‘an implied private [cause of] action is not consistent with the legislative scheme underlying the Martin Act’ [citation omitted]. That conclusion also forecloses a private cause of action under section 352-e.” (Vermeer Owners v Guterman, 78 NY2d, supra, at 1116 [emphasis supplied].)
Thus, although no express or implied private cause of action may be maintained under the Martin Act, the next issue to be determined is whether any other common-law cause of action (in contract or tort) may be maintained despite the legislative scheme underlying the Martin Act. Since the alleged promise to indemnify the plaintiff was oral, the court must also consider whether either or both causes of action (contract or tort)[4] are barred by the Statute of Frauds as embodied in section 5-701 of the General Obligations Law. In addition, the court must consider whether public policy prohibits plaintiff from bringing any cause of action as a result of her participation in prohibited activity.
Causes of Action Arising Out of ProhibitecL Conduct
The general rule precludes a party, who has engaged in an illegal agreement or transaction, from enforcing any rights *859 which arise out of such agreement, transaction or prohibited conduct. (See, Barker v Kallash, 63 NY2d 19 [1984]; Carr v Hoy, 2 NY2d 185 [1957]; Stone v Freeman, 298 NY 268 [1948]; Baksi v Wallman, 297 NY 456 [1947].) This general rule applies with equal vigor to transactions and agreements which are illegal because said conduct is prohibited by statute (malum prohibitum), as well as to conduct which is inherently wrong and prohibited by its very nature (malum in se). However, for malum prohibitum conduct, the law provides an exception and courts have consistently allowed causes of action to recover funds which were lost as a result of prohibited conduct, when the parties are not equally at fault. (Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d 124 [1992]; Rosasco Creameries v Cohen, 276 NY 274 [1937]; Duval v Wellman, 124 NY 156 [1891]; Katz v Zuckermann, 119 AD2d 732 [2d Dept 1986]; Smith v Pope, 72 AD2d 913 [4th Dept 1979].) In Lloyd (supra, at 127), the Court of Appeals explained the general rule, and its exception, as follows: “Illegal contracts are, as a general rule, unenforceable. However, '[w]here contracts which violate statutory provisions are merely malum prohibitum, the general rule does not always apply. If the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy * * * the right to recover will not be denied.’ [Citation omitted.]”
The unanimous Lloyd Bench added that it is also a general rule that “forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as ‘a sword for personal gain rather than a shield for the public good.’ ” (Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d, supra, at 128.)
Since public policy does not absolutely preclude plaintiff from asserting her claims because of her participation in this malum prohibitum activity, the court must next consider whether parol evidence should be given any weight and whether the Statute of Frauds applies to any tort or contract claim which has been raised or can be considered in these proceedings.
Tort Causes of Action and the Statute of Frauds
In New York the Statute of Frauds is embodied in section 5-701 of the General Obligations Law. It provides, in relevant part, that:
“a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and *860 subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
“1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;
“2. Is a special promise to answer for the debt, default or miscarriage of another person” (emphasis added).
The Statute of Frauds has its roots in a 17th century antifraud Act of the English Parliament which required that certain contracts must be in writing in order to be enforceable. (Act for Prevention of Frauds and Perjuries, 29 Charles II, ch 3, 8 Stat at Large 405 [1677]; see, D & N Boening v Kirsch Beverages, 63 NY2d 449, 453 [1984].) That statute, and all of its progeny statutes, including variations which have been adopted throughout the United States, were enacted in order to protect persons against certain claims which were based only on alleged oral promises which were easily susceptible to fraud and peijury. Moreover, those statutes were, for the most part, originally interpreted to provide an absolute bar to any cause of action (tort or contract) which was based on an oral representation. (See, e.g., Dung v Parker, 52 NY 494, 497 [1873].) However, most States, including New York, have come to recognize that such an absolute bar would subvert the underlying policy of the Statute and thereby provide the vehicle for scoundrels to use the Statute as a sword to commit a wrong rather than as a shield against fraudulent and perjurious statements and testimony. New York, therefore, (and most States) now interpret the Statute of Frauds as inapplicable to a tort cause of action based on fraud, even if the fraud is alleged to have occurred in connection with an unenforceable contract. Thus, it has been held that although an underlying contract may be deemed void pursuant to the Statute of Frauds, parol evidence will be admissible to prove fraud arising out of the same transaction. (Channel Master Corp. v Aluminum Ltd. Sales, 4 NY2d 403 [1958]; Sabo v Delman, 3 NY2d 155 [1957]; Cowley & Assocs. v Comtax, Inc., 100 AD2d 744 [4th Dept 1984]; Century 21 v Woolworth Co., 181 AD2d 620 [1st Dept 1992].)
In Channel Master Corp. (supra, at 408), this principal was explained as follows: “The present action is in tort, not contract, depending not upon agreement between the parties, but rather upon deliberate misrepresentation of fact, relied on by the plaintiff to his detriment. In other words, the legal relations’ binding the parties are created by the utterance of a falsehood *861 ‘with a fraudulent intent’ and by reliance thereon [citation omitted] and the cause of action is entirely ‘independent of contractual relations between the parties.’ [Citation omitted.] As we wrote in Sabo v. Delman (3 N Y 2d 155, 159, supra), ‘it is well to bear in mind that the complaint before us neither asserts a breach of contract nor attempts to enforce any promise made by defendants.’ If the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery, but, on the other hand, one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability in tort whether the agreement is enforcible or not. [Citations omitted.] The policy of the statute of frauds is ‘not directed at cases of dishonesty in making’ a promise [citation omitted]; never intended as an instrument to immunize fraudulent conduct, the statute may not be so employed.” The court concludes, therefore, that the plaintiffs claim in tort founded on fraud is not barred by the Statute of Frauds and may be proven by parol evidence.
DISCUSSION
It would appear that all of the essential ingredients of the prohibited “chain distributor scheme” are present in the Network “gifting” program. Clearly, the $2,000, which each founder is required to “gift” to the CEO, is a “means, medium, form or channel for the transferring of funds,” and thus qualifies as an “investment” as that term is defined by the General Business Law. By this investment each founder is not only granted “the license or right to solicit or recruit for profit or economic gain one or more additional persons,” but strongly urged to do so in order to perpetuate the process and to provide the ever-increasing chain of founders necessary for each board to continue to split into two new pyramids so that each founder can advance to the CEO position. Thus, the Network “gifting” program is dependent upon the right of founders and other participants to “perpetuate the chain of persons who are granted such license or right;” and each newly created pyramid board is linked to its predecessor board in what purports to be a never-ending and available chain of founders and boards.
It might be argued that the Network “gifting” program is distinguishable from the prohibited scheme defined by the General Business Law, upon the ground that, pursuant to its booklet, Network founders allegedly make a $2,000 “gift,” without a profit or economic gain motive. However, Network’s self-serving claim is obviously disingenuous since the whole *862 program is aggressively marketed on the basis of an expectation of receiving $16,000 in return for a $2,000 investment. The characterization of these investments as gifts does not change the de facto conduct of the parties and the expectations of each participant that their $2,000 investment will flower into a $16,000 windfall return. It is this return which purports to fulfill the Network booklet’s promise “to provide positive cash flow to fellow members for business expenses, debt eradication, medical expenses, back taxes, home purchases or to fulfill their dreams.” Why else would anyone give a $2,000 “gift” to a total stranger? In this case, as made abundantly clear from the testimony of the parties and witnesses, despite the self-serving claim made in the Network booklet, no one parted with $2,000 without an expectation of receiving a jackpot as a retiring CEO.
In any event, it is clear that, except for semantical differences, the Network chain recruiting operation appears virtually identical to other pyramid schemes which have consistently been held to violate the General Business Law. (See, e.g., Solon v Meuer, 141 Misc 2d 993 [Civ Ct, NY County 1987]; Cochran v Dellfava, 136 Misc 2d 38 [Rochester City Ct 1987].) In Cochran (supra), the promoters structured a four-leveled pyramid characterized as an “airplane game” in which new recruits would, for the sum of $2,200, become a “passenger” on one of eight seats on an “airplane,” which also has four “flight attendants,” two “copilots” and one “pilot.” When all passenger seats are filled, the pilot “bails out” after receiving $17,200 (i.e., $2,200 from each of the new eight passengers). The airplane would then split into two airplanes; the former eight passengers would now become flight attendants (4 in each new airplane); the former four crew members would become copilots (2 in each airplane); and the former two copilots would each become a pilot on the new airplanes. The new crew and officers of each airplane would then seek to obtain new passengers in order to keep the process continuing and keep the plane from “crashing.” In Cochran, the plane ultimately “crashed” and the plaintiff sued to recover the funds lost. The Cochran court held that the airplane game was clearly a chain distributor scheme which was prohibited by the General Business Law; and that, since the plaintiff was a willing participant in an illegal scheme and in pari delicto with the defendant, she should not be entitled to the exception to the general rule which would allow such cause of action. The court explained that “by entering the so-called ‘airplane game’ as a passenger, one is in fact *863 ‘promoting’ the game in violation of the General Business Law (e.g., encouraging the pilot to make an illegal profit; encouraging others to enter the game by example; and eventually hoping to make an illegal profit).” (Cochran v Dellfava, supra, at 41.) The court further noted that: “ ‘It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him [her] carry out his [her] illegal object’ ” (Cochran v Dellfava, supra, at 40 [citations omitted]).
In Solon (supra), an identical airplane game was also found to be a chain distributor scheme and violative of the General Business Law. However, the Solon court held for the plaintiff, stating that although the scheme was prohibited by section 359-fff of the General Business Law, recovery would be permitted under the public policy enunciated by sections 5-419 and 5-421 of the General Obligations Law, “which allow a gambling loser to recover his losses from the winner.” (Solon v Meuer, supra, at 995; but see, Ford v Henry, 155 Misc 2d 192 [App Term, 2d Dept 1993].) The Solon decision was not appealed and was thus not directly reviewed by an appellate court. However, in Ford v Henry (supra), the Appellate Term of the Supreme Court in the Second Department had an opportunity to review and disagree with the Solon holding and rationale.
In Ford (supra), the plaintiff sought the return of $1,500 paid to defendants as an entry fee to join and participate in a pyramid scheme. The trial court, following the approach of Solon v Meuer (supra), held that, on public policy grounds, plaintiff was entitled under the General Obligations Law to “recovery of money lost at wagering games.” The Appellate Term of the Supreme Court reversed the lower court, and dismissed the' complaint, stating: “The classification of chain promotional schemes under article 23-A of the General Business Law, however, indicates that ‘the Legislature has sought to isolate pyramid schemes from losses at games of chance contingent upon the happening (or not) of some specific event’ [citations omitted]. General Business Law § 359-fff contains no language abrogating the common-law rule that a party in pari delicto is without remedy at law or equity. Had the Legislature intended to create a comparable right of action to recover money lost at chain distributor schemes, it would have expressly included it, and its omission is an indication that the Legislature intended its exclusion [citation omitted]. The court thus acted in excess of its authority by expanding the scope of the statute on public policy grounds, so as to provide the *864 plaintiff with a remedy not expressly contained therein. In so doing, the court improperly substituted its judgment for that of the Legislature, by ‘reading] into [the] statute that which the Legislature might have inserted but did not’ [citation omitted].” (Ford v Henry, at 194.)
The Ford panel thus held that “The plaintiff, as a knowing and willing participant in a chain distributor scheme prohibited by law, was in pari delicto with the defendants [citation omitted], and may not, under the general principles of common law, invoke the power of the court to recover the money he lost [citations omitted].” (Ford v Henry, supra, at 193.) The Ford case however did not discuss, and apparently did not consider, the Court of Appeals rationale in Lloyd {supra), and the exception to the general rule which, for malum prohibitum conduct, allows such a common-law cause of action, when a defendant’s conduct is more egregious than that of the plaintiff. The Ford panel, apparently overlooking the common-law exception and misconstruing the rules of statutory construction (McKinney’s Cons Laws of NY, Book 1, Statutes § 301), held that “a participant is [not] entitled to recover[ ] ** * * in the absence of express statutory language conferring such right of action.” (Ford v Henry, supra, 155 Misc 2d, at 195.) However, McKinney’s Consolidated Laws of NY, Book 1, Statutes § 301 (b) provides, among other things, that: “The common law is never abrogated by implication. Statutes in contravention thereof cannot be extended by construction or by doubtful implication, to include cases or matters not fairly within the terms of the act, or within the reason as well as the words thereof. Thus, rules of the common law must be held no further abrogated than the clear import of the language used in the statute absolutely requires. Where a change in the common law is to be effectuated the legislative intent to do so must be clearly and plainly expressed * * * A statute must be read in connection with the common law existing at the time; and if the common law rule and the statute can stand together, the statute will be construed so as to effectuate both, and should not be so construed as to abolish the common-law rule.” (Emphasis supplied.)
Moreover, as stated by the Court of Appeals, “ ‘[i]f the statute does not provide expressly that its violation will deprive the parties of their right to sue * * * and the denial of relief is wholly out of proportion to the requirements of public policy * * * the right to recover will not be denied.’ ” (Lloyd Capital Corp. v Pat Henchar, Inc., 80 NY2d, supra, at 127.) As stated *865 before, the Martin Act has no express language abrogating the common-law right to bring an action to recover funds fraudulently lost.
CONCLUSION AND DECISION
As to Defendant Villacruz
In this case, plaintiff was provided with sufficient material and information which should have alerted her to all of the risks and the possible illegality of this venture in New York State. Although initially induced by the guarantee of the defendant Terez, she thereafter became a willing participant into an ongoing and well-established series of pyramids and she actively promoted the venture in New York State by soliciting and encouraging others to join and invest their funds in this prohibited activity. She appears to be, despite some limitations with the English language, an educated and knowledgeable person who was caught up in the allure of easy money. Although she was a victim of this scheme, she also became an active participant, and she either knew, or should have known, that it was a risky venture and prohibited by law. Unfortunately, except for the original founders, and perhaps some participants like the defendants, who became aggressive promoters of the pyramid, most recruits like the plaintiff are willing participants as well as its victims. The fact that plaintiff and other recruits were given assurance, and may have mistakenly believed, that the scheme was legal does not relieve them of the requirements of the law and the general rule which bars any cause of action against those with whom said plaintiffs were in pari delicto. (See, Cochran v Dellfava, supra; Ford v Henry, supra; People v Riccelli, 149 AD2d 941 [4th Dept].)
The testimony and other evidence presented at these hearings leads the court to conclude that the plaintiff Pacurib and the defendant Villacruz were in pari delicto; and that plaintiff should thus be barred from bringing an action against this defendant. Accordingly, in the proceedings against the defendant Villacruz, the complaint is dismissed.
As to Defendant Terez
Since the court is satisfied that the conduct of defendant Terez was more egregious than that of plaintiff, and that defendant Terez did fraudulently induce the plaintiff to join under the false pretense that her funds would be returned in the event that the program did not work, plaintiffs cause of action *866 against this defendant should be sustained. Since neither the Martin Act nor the Statute of Frauds precludes a common-law tort or contract cause of action, and since the conduct of the defendant Terez in this malum prohibitum activity was much more egregious than that of plaintiff, the court will invoke the exception to the general rule, and direct that the defendant Terez return the funds ($2,000) which the plaintiff lost as a result of her initial investment in this prohibited activity. Such a verdict is consistent with the “fundamental maxim of the common law” as well as the public policy of this State, that “[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong.” (Riggs v Palmer, 115 NY 506, 511 [1889].) For the reasons above stated, such an exception and verdict are not warranted as to the defendant Villacruz.
Accordingly, in the proceeding against the defendant Terez the court holds for the plaintiff in the sum of $2,000 without interest, costs or disbursements.
[Portions of opinion omitted for purposes of publication.]

. Since these small claim proceedings involve common questions of law and fact, they have been jointly tried; and the hearings herein were conducted “in such manner as to do substantial justice between the parties according to the rules of substantive law.” (CCA 1804-A.) CCA 1804-A also provides that in pursuit of substantial justice, “The court * * * shall not be bound by statutory provisions or rules of practice, procedure, pleading or evidence.”

. The booklet states that: “A pyramid by definition is a system of people enrolling into a structure which ‘increases rapidly and on a widening base at the bottom.’ The person at the top of the pyramid is in a permanent position; *853 they never leave or retire. Our Gifting Boards never get any larger then seven active members, which are looking for eight new gifting members, and our CEO retires each time there is a gifting from those eight new members.”

. Consider the mathematical computations and the geometric progression demonstrated by the following chart:
Levels of New Participants Necessary Total Paying Progression For Each Newly Created Board to Split and Continue Founders
0 7 (nonpaying original officers) 0
1 8 (new founders necessary to continue) 8
2 16 24
3 32 56
4 64 120 5 128 248
6 256 504
7 512 1,016
8 1,024 2,040
9 2,048 4,088
10 4,096 8,184
11 8,192 16,376
12 • 16,384 32,760
13 32,768 65,528
14 65,536 131,064
15 131,072 262,136
16 262,144 524,280
17 524,288 1,048,568
18 1,048,576 2,097,144
19 2,097,152 4,194,296
20 4,194,304 8,388,600

. Although the plaintiff has not asserted a cause of action in contract, she would not be precluded from doing so since this court is not bound by the pleadings (see, CCA 1804-A), and the oral agreement does not come within either of the aforesaid prohibitions set forth in the Statute of Frauds. (See, Cron v Hargro Fabrics, 91 NY2d 362 [1998]; see also, Jones v Bacon, 145 NY 446 [1895]; G. Carver Rice, Inc. v Crawford, 84 AD2d 866, 867 [3d Dept 1981]; Braverman v Metropolis Bowling Ctrs., 18 AD2d 1089 [2d Dept 1963]; 61 NY Jur 2d, Frauds, Statute of, § 79.) A complete discussion of plaintiff’s right to maintain a cause of action in contract is set forth in the unedited edition of this decision, which is on file with the clerk of the court.