Argued and submitted January 7, 2003, affirmed May 12, petition for review denied July 27, 2004 (337 Or 248)

Dan NIELSEN,
Ray Sweat, and Shara Sweat,
*Appellants,*

*and*

Quincy NEWMAN
and Darrel Micka, deceased,
*Plaintiffs,*

*v.*

Hardy MYERS,
Thomas K. Elden, and Steve Sandercock,
*Defendants,*

*and*

STATE OF OREGON,
*Respondent.*

9904573 CV; A113071

90 P3d 628

William R. Goode argued the cause and filed the brief for appellants.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

**LINDER, J.**

Plaintiffs in this case participated in a "gifting club" in which they and others paid cash—either $2,000 or $6,000—to obtain a position on a pyramid-shaped "board" in the hope that they might eventually move to the top of the board and receive a large return (more than $13,000) on their investment. Their success in reaching the top depended on a sufficient number of additional individuals being recruited to also make a cash "gift" to participate. The Oregon Attorney General concluded that the club was an illegal pyramid scheme and took steps to halt it. In response, plaintiffs brought this declaratory judgment action seeking to have their activities declared lawful and to enjoin the Attorney General from further efforts to force them to cease involvement with the club. On cross-motions for summary judgment, the trial court concluded that the gifting club was an unlawful pyramid club under the Oregon Unlawful Trade Practices Act (UTPA) and entered a declaration accordingly. *See* ORS 646.608(1)(r). Following a further evidentiary proceeding, the court imposed a $25,000 civil penalty against plaintiff Ray Sweat. *See* ORS 646.642(1). Plaintiffs appeal,[1] and we affirm.

The gifting club that gave rise to this case was named, inscrutably, the Northwest Family Reunion (NWFR).[2] As explained to the participants, the NWFR gifting

---

[1] This appeal is pursued only by plaintiffs Nielsen and Ray and Shara Sweat.

[2] Our recitation of facts draws from the trial court's factual findings, as well as from other facts contained in the summary judgment record, which we view in the light most favorable to plaintiffs. ORCP 47 C; *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001). We note in that regard that plaintiffs do not assign error to the trial court's failure to grant their motion for summary judgment. *See To v. State Farm Mutual Ins.*, 123 Or App 404, 411, 860 P2d 294 (1993), *aff'd in part and rev'd in part on other grounds*, 319 Or 93, 873 P2d 1072 (1994) (fact that a trial court errs in granting one party's motion for summary judgment does not mean that the trial court necessarily erred in denying a cross-motion for summary judgment). Therefore, the only issue before us is whether the state's motion was correctly granted. In its summary judgment order, the trial court concluded that there were no disputes of material fact and made extensive factual findings, none of which plaintiffs disputed below or challenge on appeal.

club used a board called the "Pit Stop Report," which consisted of four levels and a total of 15 positions for participants. NWFR invoked a race car analogy to denominate positions on different levels of the board, with the first level positions (*i.e.*, lowest) termed "pit crew," the second-level positions termed "mechanics," the third-level positions termed "pace cars," and the top-level position termed the "lead driver." By committing to pay $2,000 in cash to NWFR, a participant obtained a "pit crew" position on the first level. Once the first level, consisting of eight positions, was filled, the newly joining participants "gifted" their $2,000 to the person at the top of the board.[3] The actual exchange of money took place at a so-called gifting meeting or ceremony. Because of acknowledged uncertainty about the legality of the activities in Oregon, the actual giftings were held in Washington. After the gifting to the person at the top of the board, the board split into two new boards, and each participant moved up one level. The sequence then would begin anew. That is, a new group of participants would be recruited to fill the first level; when the first level was fully filled, the new participants would gift their $2,000 participation fee to the top person on the board; and the board would then split into two boards. The sequence was to continue *ad infinitum*, with new members continually being recruited to join with the hope of reaching the top of the board.[4]

Pursuant to the NWFR rules, an investor could pay $2,000 to name another person to a position on a board, but names listed on boards could not be changed without approval. One NWFR participant, Pemberton, explained that he paid to obtain positions for his wife and aunt, who were unaware that he had placed their names on boards. NWFR rules prohibited participants from taking part in more than

---

[3] People at the top of the board netted $13,500, although a total of $16,000 was paid by the new participants. Of the $16,000, $500 had to be used to pay for any overhead associated with the gifting facility, such as rental of a room and the cost of providing dinner to the participants. Also, a condition of being gifted was participation in a new round of gifting by paying $2,000 to join another board.

[4] NWFR also operated a board called the "Main Event," which operated in the same basic manner as the Pit Stop Report but had positions for fewer participants, a larger investment requirement, and a larger potential payout. We describe the facts in terms of how the Pit Stop Report operated, because it apparently was the primary board used by NWFR and because plaintiffs' brief focuses solely on it.

four boards at a time. Anyone could solicit people to join NWFR and could otherwise talk about and tell others about the gifting scheme. But given the structure of the scheme, only those named on boards stood to gain by recruiting new participants—in doing so, they improved their chances of reaching the top of the pyramid and receiving a windfall, one that NWFR represented would be tax free.

NWFR was introduced to the Klamath Falls area in 1999 by plaintiff Micka,[5] who learned about the gifting activities from NWFR organizers in Washington. Micka, in turn, told plaintiffs about NWFR and encouraged them to participate. Plaintiffs paid to obtain positions on boards for themselves, and each induced at least one other person to participate in NWFR. Plaintiffs also organized NWFR in the Klamath Falls area. Word of NWFR's activities passed among family members, friends, work associates, and even casual acquaintances. Those interested in NWFR attended meetings where the rules of the club were explained, as was the prospect for making a significant return on their money. People who invested $2,000 in NWFR in fact were drawn by the possibility—which they understood not to be a promise or guarantee—that they potentially would reap a much larger amount of tax-free cash.

In late July 1999, the Oregon Attorney General issued a press release, which was published in the Klamath Falls newspaper, announcing the Attorney General's legal opinion that NWFR was a pyramid club in violation of the UTPA and warning that participants could face fines of up to $25,000 for each attempt to recruit a new participant. At that point, all of the plaintiffs save one—Ray Sweat—ceased their involvement with NWFR. After the press release was published in the Klamath Falls newspaper, Sweat invited Ritchie, a previous NWFR participant, to attend two giftings, but Ritchie declined.[6]

---

[5] Micka was one of the original plaintiffs but is no longer a party due to his death.

[6] There are factual disputes regarding Sweat's activities, but those disputes are relevant only to plaintiffs' challenges to the $25,000 civil penalty imposed on Sweat by the trial court, which followed a full evidentiary proceeding. We therefore state the facts in the light most favorable to the trial court's judgment.

In the two months following the press release, the Attorney General's office served each plaintiff with an investigative demand, a notice of unlawful trade practices, and a proposed assurance of voluntary compliance (AVC). *See* ORS 646.632. Plaintiffs refused to sign the AVCs and instead filed an action against the state in Klamath County, seeking a declaration from the trial court that NWFR is legal under the UTPA and requesting injunctive relief against the state. The state counterclaimed, seeking a declaration that plaintiffs had engaged in an unlawful trade practice under ORS 646.608(1)(r), an injunction to prohibit plaintiffs from further involvement with NWFR, a penalty of $25,000 for each willful violation of the UTPA, and attorney fees.

Both parties moved for summary judgment. The trial court granted the state's motion and denied that of plaintiffs, concluding that NWFR was a "cash-for-cash pyramid club" in violation of the UTPA. *See* ORS 646.609 (defining "pyramid club"). The trial court also permanently enjoined plaintiffs from becoming involved in pyramid clubs in the future. After a trial on the issue of penalties, the trial court assessed a $25,000 penalty against Ray Sweat, finding that he willfully violated the UTPA by inviting Ritchie to two giftings after the Attorney General's press release had been published in the local newspaper. *See* ORS 646.642(3). Plaintiffs moved for a new trial, which the court denied, and this appeal followed.

■ On appeal, we address only plaintiffs' claim that the trial court, in granting summary judgment in favor of the state, erroneously concluded that NWFR legally qualifies as a pyramid club under ORS 646.609.[7] We therefore begin with an overview of the portions of the UTPA relevant to that issue.

Oregon's UTPA is a comprehensive statute for the protection of consumers, one that provides for both public and private enforcement. *State ex rel Redden v. Discount Fabrics*, 289 Or 375, 382, 615 P2d 1034 (1980). ORS

---

[7] The remainder of plaintiffs' challenges either were not preserved below, are fact-bound, or otherwise do not merit resolution by way of written opinion.

646.608(1) sets forth a nonexclusive but extensive list of practices that are unlawful when done in the course of a person's business, vocation, or occupation. Relevant here is paragraph (1)(r), which prohibits organizing, inducing, or attempting to induce membership in a pyramid club. The term "pyramid club" is defined in ORS 646.609, as pertinent here, as

> "a sales device whereby a person, upon condition that the person make an investment, is granted a license or right to solicit or recruit for economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and who may further perpetuate the chain of persons who are granted such license or right upon such condition."

Drawing from that definition, plaintiffs advance several theories in support of their argument that, as a matter of law, the NWFR gifting club did not legally qualify as a pyramid club. We consider each argument in turn.

First, plaintiffs insist that their activities did not violate ORS 646.608(1)(r) because NWFR did not require a $2,000 investment as a condition to the right to solicit or recruit additional participants. In particular, plaintiffs rely on repeated representations by NWFR organizers and participants that anyone could talk about NWFR's activities and anyone could encourage, solicit, or recruit others to participate in NWFR. Said another way, no one had to be a participant in the gifting club or pay for a position on one of NWFR's boards to be able to encourage others to participate in NWFR's investment scheme.

We agree with the state, however, that the text of the statute readily answers plaintiffs' argument in that regard. The vice to which the statute is directed is not the granting of a license or right to solicit or recruit, without more. Rather, the statute describes the right as a "license or right to solicit or recruit *for economic gain*." ORS 646.609 (emphasis added). The record establishes, as plaintiffs contend, that anyone could talk about and encourage participation in NWFR's gifting scheme. But the record also establishes that the only persons who stood to gain economically from doing so were persons who were participants on the boards. The factual evidence is undisputed that the only way

to be a participant was to make an investment of $2,000 in exchange for a place on the board. *A fortiori*, to solicit or recruit *for economic gain*, a person had to invest money in NWFR. Thus, as the definition requires, NWFR in fact conditioned the right or license to solicit or recruit *for economic gain* on making an investment.

■　That analysis invites two further questions, however: Who has to make the investment? And who has to acquire the right to solicit for economic gain? Plaintiffs argue that ORS 646.609 requires that the person who makes the investment—that is, who tenders the $2,000—be the same person who possesses the right to solicit for economic gain. That proposition leads plaintiffs to their second theory for why the NWFR gifting club did not legally qualify as a pyramid club—*viz.*, under NWFR's rules, an investor could place anyone's name on a board; the name did not have to be the investor's own. In fact, the record establishes that at least one investor, as earlier noted, secured two positions and then placed his wife's and aunt's names on boards without their knowledge. According to plaintiffs, the fact that the economic gain could be realized by someone other than the investor defeats a conclusion that NWFR's gifting club is a pyramid club within the meaning of ORS 646.609.

The state responds:

> "The evidence establishes that participation in NWFR meant having a slot on a board, with an attendant possibility of being 'gifted,' that could only be obtained through payment of $2,000 for that slot. As plaintiffs acknowledge, participants were 'paying for slots on boards.' It is immaterial whether the investment to obtain a slot was made by the person whose name was placed on the board or by someone else, on that person's behalf. Either way, NWFR functioned as a pyramid club, by conditioning participants' right to recruit for economic gain on an investment."

The state's position, as we understand it, is that the statute is indifferent to who exercises the right to recruit for economic gain and is aimed, instead, at the sale of such a right, regardless of who acquires the right.

The literal text of the statute supports both parties' readings. On the one hand, as plaintiffs emphasize, the text

describes a pyramid club as a sales device "whereby *a person*, upon condition that *the person* make an investment, is granted" the right to solicit or recruit new participants for economic gain. ORS 646.609 (emphasis added). The legislature's use of the definite article "the" is some indication that it intended to refer to a previous part of the statute. *See Osborn v. PSRB*, 325 Or 135, 142, 934 P2d 391 (1997). That would mean, then, that *the* person who makes an investment must be the same one who is granted the right to solicit or recruit new participants for economic gain. On the other hand, consistently with the state's position, the statute does not specify *who* must stand to economically gain by the recruitment efforts. Therefore, the statute may be satisfied as long as a right to solicit or recruit for someone's anyone's—economic gain is given in exchange for the investment.

■      On the record before us, however, it is unnecessary to resolve that interpretative issue. Assuming, without deciding, that ORS 646.609 requires that the investor be the same person who acquires the right to solicit or recruit new members for economic gain, NWFR's practice of permitting investors to name other people to positions on boards satisfies that requirement. On those facts, at least initially, the investor *is* the person who holds the right to solicit for economic gain. The record is clear that, as a condition of placing one's own name—or someone else's—on a board, a person must either tender or commit to tendering $2,000 in cash. Once that is done, that person may place his or her name, or anyone else's name, on a board. At the moment of tender, the person making the investment is in full and unilateral control over who will be the named participant on the board. Thus, the investor *acquires* the right to solicit or recruit for economic gain, even if the investor chooses not to retain that right. By placing another name on the board, the investor effectively assigns or transfers the right acquired to another person. In the interim, however, the right was acquired by the investor *in exchange for the investment*. That is enough to satisfy the statute.[8]

---

[8] Analogously, in the federal income tax context, it is axiomatic that "[t]he power to dispose of income is the equivalent of ownership of it." *See, e.g., Helvering v. Horst*, 311 US 112, 118, 61 S Ct 144, 85 L Ed 75 (1940). That is, a person is taxed

■       Plaintiff's final theory for why the NWFR gifting scheme did not legally qualify as a pyramid club is that the reference in ORS 646.609 to a "sales device" requires some form of deception, trick, or misrepresentation in the inducement to participate in the scheme. For that, plaintiffs rely on one of several potentially applicable dictionary definitions.[9] Plaintiffs emphasize that all of the participants understood that their money was at risk and that it would be gifted to the person at the top of the board with only the hope, not the promise, of a return. Thus, according to plaintiffs, because no misrepresentation was made to induce people to participate, no sales device was involved and the gifting scheme, as a matter of law, was not a pyramid club.

But the statutory reference to sales device must be considered in context. So considered, the term is self-defining. The statute provides that a pyramid club is a "sales device *whereby* a person, upon condition that the person make an investment, is granted a license or right to solicit or recruit for economic gain one or more additional persons who are also granted such license or right * * *." ORS 646.609 (emphasis added). By force of the word "whereby" in the statute, a sales device within the statute's meaning exists wherever the investor buys nothing more than the right to possibly make money by recruiting others to buy the same right to recruit for possible economic gain, and so on *ad infinitum*. In other words, the chain of investments *is* the sales device that the statute proscribes. So understood, the term "device" takes on its common meaning of "scheme." *Webster's Third New Int'l Dictionary* 618 (unabridged ed 1993).

---

on income that he or she is entitled to receive, whether or not he or she actually receives it, and an assignment of the right to receive income—either before or after the assignor became entitled to receive it—does not affect its taxability to the assignor. *Id.* at 118-20. That rule serves to prevent taxpayers from circumventing the purpose of the income tax statute by making "anticipatory arrangements * * * to prevent the income from vesting even for a second in the donor." *Id.* at 120 (internal quotation marks omitted).

[9] Plaintiffs purport to rely on *Webster's Third New Int'l Dictionary* (unabridged ed 1993) as including "a crafty scheme" and "a trick" among the applicable definitions of "device." But they do not cite a reference page for that representation, and our review of the definitions in *Webster's* fails to support their quoted definitions, although similar ones exist (*e.g.*, "a scheme to deceive or overreach : artifice, stratagem"). *Id.* at 618.

We further agree with the state that, to the extent that ORS 646.609 requires deception, it contemplates only the deception that is inherent in the kind of investment scheme that the statute itself describes. The pyramid scheme involved in this case is a classic one; only the nomenclature and analogies distinguish it. This one was based on car racing, with positions denominated pit crew, mechanics, and so on. Nearly identical pyramid schemes have been devised using, for example, "airplane" analogies (with passenger, crew, copilot, and pilot positions on the boards)[10] or corporate organizational models (with positions for founders, vice-presidents, presidents, and a CEO on the boards).[11] All operate in essentially the same way. At the bottom of the pyramid are new investors, who pay for the right to place a name on the board. When the bottom layer is filled, the new investment money is given to the person in the topmost position, the board splits in two, and new investors must be recruited for the participants to continue to move up through the levels to reach the top position, which is the only point at which those participants will, if ever, receive an economic gain.

As other courts have observed, such schemes are "inherently deceptive." *Kugler v. Koscot Interplanetary, Inc.*, 120 NJ Super 216, 232, 293 A2d 682, 690 (1972). Nothing in this record suggests that participants in NWFR had any awareness of the number of participants necessary to perpetuate the gifting cycle given the exponential increase in the number of boards every time a board "splits." Nor did they know how long the boards had been in existence or to what degree the pool of potential participants had been exhausted. That lack of awareness, which is commonplace, is the "core deception" of the pyramid scheme. Eric Witiw, *Selling the Right to Sell the Same Right to Sell: Applying the Consumer Fraud Act, the Uniform Securities Law, and the Criminal Code to Pyramid Schemes*, 26 Seton Hall L Rev 1635, 1637 (1996).

The reality is that, after a "relatively small number of progressions and divisions, a pool of multi millions of

---

[10] *See, e.g., State ex rel Mays v. Ridenhour*, 248 Kan 919, 811 P2d 1220 (1991).

[11] *See, e.g., Pacurib v. Villacruz*, 183 Misc 2d 850, 705 NYS2d 819 (NY Cir Ct 1999).

persons would be required to provide this voracious amoeba-like pyramid with the number of [new participants] necessary for it to continue to divide and exist." *Pacurib v. Villacruz*, 183 Misc 2d 850, 855, 705 NYS2d 819, 823 (NY Cir Ct 1999). As explained in *Pacurib*, which involved a scheme that used a corporate organizational analogy:

> "For the original [eight] investing founders to reach the apex of the pyramid * * *, the board must progress three levels and 48 new founders must join making a total of 56 participants. Moreover, in order for these [eight] investing founders to retire and be paid, the board must progress another level and 64 new founders must join the eight boards headed by these [eight] CEOs. At this level, a total of 120 paying founders will have participated. Although sufficient possible recruits are available at these early stages of the program, the pool of available people rapidly dissipates as the program progresses. As the chart demonstrates,[12] at the 20th level 4,194,304 new investing founders would be required in order for all previous CEOs to be paid and retire; and at that level a total of 8,388,600 investing founders will have participated. Just to advance one additional level, these 20th level founders would require an additional 8,388,608 new founders, thus making a total of 16,777,208 participating founders. In addition, consider the staggering number of new recruits which would be necessary for all of these 20th level founders to advance to the CEO position. Obviously, such a pool of persons would more than exhaust even the largest of the population centers in the United States."

*Id.* at 856, 705 NYS2d at 824 (emphasis omitted); *see also* Witiw, 26 Seton Hall L Rev at 1636-37 (citing New Jersey Bureau of Securities calculations for the proposition that, at approximately the 21st level of a four-level pyramid, "an entering participant would cash out at the twenty-fifth level, requiring participation of over 268,000,000 people[,] * * * more than the population of the United States"). Like all chaining schemes, pyramid investment clubs are "doomed to ultimately fail since the continued existence of such [schemes

---

[12] To illustrate the mathematical computations and geometric progressions involved, we borrow from a chart set forth by the court in *Pacurib*, 183 Misc 2d at 854 n 3, 705 NYS2d at 823 n 3:

is] dependent upon reaching and convincing an ever increasing number of new participants which are, in reality, not available." *Pacurib*, 183 Misc 2d at 855, 705 NYS2d at 823 (emphasis omitted). Thus, the deception exists "because, for most participants, success is impossible and a loss of funds is all but guaranteed." *Id.*; *see also State v. Bey*, 261 NJ Super 182, 184 n 2, 618 A2d 373, 374 n 2 (1992).

In short, we do not agree with plaintiffs that the legislature, in defining a pyramid club as a sales device of a particular kind, imposed a requirement that the scheme involve overt deception or misrepresentation in inducing investors to invest. To the contrary, the legislature specifically qualified the prohibited sales device as one "whereby" an investor, rather than purchasing a right to a product or service, buys only the right to recruit other investors for economic gain, who then, in chain-link fashion, purchase the same right. The legislature undoubtedly did so in recognition that such a pyramid scheme is inherently deceptive. Thus, merely qualifying as an investment scheme of the type that the statute describes, as NWFR's gifting club did in this case, is enough

| Levels of Progression | New Participants Necessary For Each Newly Created Board To Split and Continue | Total Paying Founders |
| --- | --- | --- |
| 0 | 7 | 0 |
| 1 | 8 | 8 |
| 2 | 16 | 24 |
| 3 | 32 | 56 |
| 4 | 64 | 120 |
| 5 | 128 | 248 |
| 6 | 256 | 504 |
| 7 | 512 | 1,016 |
| 8 | 1,024 | 2,040 |
| 9 | 2,048 | 4,088 |
| 10 | 4,096 | 8,184 |
| 11 | 8,192 | 16,376 |
| 12 | 16,384 | 32,760 |
| 13 | 32,768 | 65,528 |
| 14 | 65,536 | 131,064 |
| 15 | 131,072 | 262,136 |
| 16 | 262,144 | 524,280 |
| 17 | 524,288 | 1,048,568 |
| 18 | 1,048,576 | 2,097,144 |
| 19 | 2,097,152 | 4,194,296 |
| 20 | 4,194,304 | 8,388,600 |

to bring the scheme within the statutory prohibition. The trial court therefore correctly granted summary judgment for the state and declared the gifting club activities to be unlawful under the UTPA.

Affirmed.